# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――――

№ 21-CV-4020 (RER) (MMH)

―――――――――――――

## DOROTHY MCCARTHY

VERSUS

## MOTOROLA SOLUTIONS INC. & JOSHUA THOMPSON

―――――――――――

**MEMORANDUM & ORDER**

August 28, 2024

―――――――――――

**RAMÓN E. REYES, JR., U.S.D.J.:**

Dorothy McCarthy ("Plaintiff" or "McCarthy") brings this action against Motorola Solutions Inc. ("Motorola") and Joshua Thompson ("Thompson") (collectively, "Defendants"), alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101, *et seq.* (ECF No. 1 ("Compl.")). Before the Court is Defendants' motion for summary judgment. (ECF No. 56). After carefully reviewing the record, and for the reasons set forth herein, the Court grants Defendants' motion with respect to Plaintiff's ADEA claims and dismisses Plaintiff's NYCHRL claims without prejudice.

## **BACKGROUND**

I.    The Parties' 56.1 Statements and Plaintiff's Affidavit

The Court takes the following facts from the parties' statements of material facts pursuant to Local Civil Rule 56.1 and the record of admissible evidence. *See Giannullo*

*v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Local Civil Rule 56.1 requires that all motions for summary judgment be "accompanied by a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," and the opposing party must submit "a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party[.]" Loc. Civ. R. 56.1(a)–(b). Statements under both subsections, "including each statement denying and controverting any statement of material fact, must be followed by a citation to evidence that would be admissible[.]" Loc. Civ. R. 56.1(d).

Typically, the nonmovants "failure to respond or contest the facts set for by the movant in its Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 308 (E.D.N.Y. 2013) (quotation omitted and alterations adopted). Likewise, "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases). To that end, "[w]hen a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in [Rule 56 of the Federal Rules of Civil Procedure], must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).

Here, Defendants argue that there are multiple instances where Plaintiff's responsive Rule 56.1 statement disputes Defendants' statement of facts by "responding with statements that either do not speak to the facts that Defendants presented, mischaracterize the record, or are conclusory and not even factual on their face." (ECF No. 58 ("Defs.' Reply") at 1). Defendants point to concrete examples in support of their argument. (*Id.* at 1–2). For the most part, these few instances are immaterial to the Court's consideration of Defendants' Motion, but where Plaintiff's responsive 56.1 statements are conclusory denials unsupported by the evidence, the Court will deem those facts admitted. Where any other facts are supported by citations to evidence, the Court will address the disputes of fact to the extent that they are relevant.

Likewise, Defendants assert that Plaintiff "submits a post-deposition self-serving sham affidavit in an attempt to disavow [deposition] testimony." (Defs.' Reply at 2; *see* ECF No. 57-1 ("Pl.'s Decl.")). "[A] party cannot create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) (quotation omitted). To that end, "a party cannot create a triable issue of fact, and thus avoid summary judgment, by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember." *Fed. Deposit Ins. Corp. V. Murex LLC*, 500 F. Supp. 3d 76, 94 (S.D.N.Y. 2020) (collecting cases). This rule does not apply when: (1) "the subsequent sworn statement either does not actually contradict the affiant's prior testimony or addresses an issue that was not, or was not thoroughly, explored in the deposition;" or (2) "the

deposition testimony at issue is contradicted by evidence other than the deponent's subsequent affidavit." *Id.* at 94–95 (quotations omitted).

Here, the Court reviewed the seven-page declaration for inconsistencies and finds that there indeed are statements that squarely contradict McCarthy's deposition testimony. (*See, e.g.*, Pl.'s Decl. ¶ 33). Consequently, where there are actual contradictions between the declarations and deposition testimony, the Court will exclude those declaration statements from consideration. *See Murex LLC*, 500 F. Supp. 3d at 96 (the court considered the challenged, post-deposition declarations "but only to the extent that each augments, without contradicting, [the declarant's] deposition testimony, addresses issues not explored thoroughly in [those] deposition[s], or finds support in other evidence in the record") (quotation omitted).

II.     Factual Background

A.      Plaintiff's Employment in the Brooklyn Office

Beginning around September 2018, McCarthy worked as a contractor for Pinnacle Telecomm Group LLC ("Pinnacle") to engage in project management for Motorola. (ECF No. 57-1 ("Pl.'s 56.1") ¶ 2). When she was hired by Pinnacle, McCarthy was interviewed by three Motorola employees: Thompson, Diana Gallego ("Gallego"), and Chris Sullivan. (ECF No. 56-2 ("Healey Decl."), Ex. B ("Thompson Dep. Tr.") at 62:14–63:2). In July 2019, Thompson asked McCarthy if she wanted to be a Motorola employee. (ECF No. 56-1 ("Defs.' 56.1") ¶ 13; Pl.'s 56.1 ¶ 13). Plaintiff was subsequently hired as a Senior Project Manager to work out of Motorola's Brooklyn office with a start date around October 31, 2019. (Defs.' 56.1 ¶ 15–16; Pl.'s 56.1 ¶ 15–16).

At some point in October 2019, prior to working directly for Motorola and based on McCarthy's work as a contractor, Gallego told McCarthy and her team that they were the reason that a project failed. (Healey Decl., Ex. A ("Pl.'s Dep. Tr.") at 91:4–24, 115:2–23). Also around this time, Gallego and another employee told Thompson that they did not think that Plaintiff would succeed as a project manager. (Thompson Dep. Tr. at 83:12–17). Thompson called Kim Marks ("Marks") in Motorola's human resources department to ask if they could rescind McCarthy's employment offer. (*Id.* at 94:13–23).

McCarthy officially started working as a fulltime Motorola employee around October 31, 2019. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15). At that time, she was seventy-three years old. (Pl.'s 56.1 ¶ 1). As part of her onboarding, McCarthy gave her passport to Thompson. (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21; ECF No. 57-3 ("Nanau Decl."), Ex. 16). Upon return of her passport, although Thompson did not comment on her age, McCarthy describes him as looking "very surprised," which she believes this was due to him learning her age. (Defs.' 56.1 ¶ 22; Pl.'s 56.1 ¶ 22; Pl.'s Dep. Tr. at 126:16–127:6).

McCarthy began training with two other new Motorola employees who were around the same level as her (Pl.'s Dep. Tr. at 136:10–137:13) and was assigned to project manage the testing team for the Networking Time Protocol for the Department of Information Internet Technology and Telecommunications ("DoITT") client. (Defs.' 56.1 ¶ 32; Pl.'s 56.1 ¶ 32). Also around this time, Thompson pulled McCarthy aside for a one-on-one meeting. (Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35). Thompson told McCarthy that she needed to "prove her competency." (Pl.'s Dep. Tr. at 109:7–13). He also said that McCarthy did not "fit in." (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36). McCarthy believes that this

statement was about her age, although Thompson never explicitly said as much. (Pl.'s Dep. Tr. at 126:6–12).

The DoITT testing was conducted in front of the client and "failed." (Defs.' 56.1 ¶ 33). Thompson explained to McCarthy and her team that "there should not have been a failure if there was a dry run that was performed and we shouldn't have scheduled the test if we didn't complete the dry run." (Thompson Dep. Tr. at 110:21–111:2). Although it was not McCarthy's fault alone, Thompson stated that because she was the senior project manager, she took ownership of the events. (Thompson Dep. Tr. at 114:3–9). Meanwhile, McCarthy contends that the unsuccessful test was not a failure, but that a piece of equipment at another site had simply malfunctioned, and after running diagnostics, once that equipment was replaced, everything ran flawlessly. (Pl.'s Dep. Tr. at 187:10–188:20).

In late December, when Gallego travelled out of state for work, she asked McCarthy to cover her on the Sea View Hospital project. (Pl.'s Dep. Tr. at 199:15–25). Gallego instructed McCarthy not to talk directly with the client. (Pl.'s Dep. Tr. at 200:2–5; Thompson's Dep. Tr. at 152:14–19). Upon Gallego's return, McCarthy heard Gallego say to Thompson on the phone, "she doesn't know what she's doing . . . [a]nd she's the project manager." (Pl.'s Dep. Tr. at 203:8–19). McCarthy says this is how she learned she was the project manager on the Sea View project, which she verified with Thompson. (Pl.'s Dep. Tr. at 203:20–204:3; Thompson Dep. Tr. at 141:11–142:14). There was an incident with the project regarding a broken piece of cement, and it is unclear exactly whose fault it was. (*See* Pl.'s Dep. Tr. at 200:14–201:5; Thompson Dep. Tr. at 144:8–149:21). The project was also completed. (Pl.'s Dep. Tr. at 210:4–20).

In January 2020, Thompson began weekly one-on-one meetings with McCarthy.

(Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35). McCarthy recalls that Thompson told her:

> I was incompetent, I was overpaid, I was – I should be demoted, I
> didn't fit in, and he could use the money for other things. . . . And so
> that was the – the real purpose of the meeting was – all of the
> meetings that I had with him one-on-one in that little office was to
> constantly bully, demean, and you know, make me feel horrible. And
> I did . . . there was nothing redeeming about – I didn't learn a thing
> having meetings with him. I just learned that he wanted me out, and
> he was going to continue over and over, so long as we were meeting,
> to berate me and tell me maybe when you walk out that door,
> security's going to be there and you're out of here. So it was – it was
> that kind of an atmosphere all of the time, and I just – it was
> impossible.

(Pl.'s Dep. Tr. at 174:20-176:9).

On January 23, 2020, McCarthy requested a meeting with Miraj Oza ("Oza"), the

Northeast Systems Integration Director to whom Thompson reported. (Defs.' 56.1 ¶ 57;

Pl.'s 56.1 ¶ 57). Between January 24 and 31, Plaintiff emailed with Jessica Roby ("Roby")

in human resources about the office environment as well. (Pl.'s Dep. Tr. at 222:12–13;

Defs.' 56.1 ¶ 62–63; Pl.'s 56.1 ¶ 62–63). Shortly thereafter, on February 9, McCarthy sent

a registered letter to the Motorola offices in Chicago explaining the harassment that she

had been subjected to in the Brooklyn office, which she forwarded to Marks and Roby.

(Nanau Decl., Ex. 27). McCarthy stated:

> Please be advised that Dorothy Bohnenberger (McCarthy) upon
> becoming an employee at Motorola Solutions from October 30, 2019
> through, February 7, 2020 has been subjected to a hostile and
> discriminatory work environment based on age. No other "new
> employees" that began employment in the Brooklyn, NY office at the
> same time were asked to demonstrate their abilities by
> accomplishing certain tasks that Josh Tompson said were necessary
> for me to prove my Project Manager competency. The necessity for
> this extraordinary treatment was that Mr. Thompson said he needed
> validation of my abilities in order for me to remain at Motorola
> Solutions.

(*Id.* at 3). McCarthy explained that the first "test" was part of the DoITT project, which she completed, writing that "Mr. Thompson and Ms. Gallego reviewed my work and indicated their approval for submission," and that after becoming aware of the fact that DoITT accepted the project, Gallego "pulled the Milestone Certificate with my name on it and placed a new certificate with her own name on it," which nullified McCarthy's work. (*Id.*). McCarthy explained the second project to prove her competency was the Sea View project, which, after confusion over who was the project manager, McCarthy completed early and on budget. (*Id.* at 4). However, McCarthy stated that Thompson told her that the project was not a success because it was over budget and not on time, but that yet again, Gallego pulled the Certificate for Completion and placed her name on it. (*Id. see also* Thompson's Dep. Tr. at 219:19–221:19). McCarthy also described her one-on-one meetings with Thompson. (Nanau Decl., Ex. 27 at 4–6).

McCarthy believes that shortly thereafter, the information from this letter was shared because Gallego and Thompson made two comments referencing specific items included in the letter. (Pl.'s Dep. Tr. at 151:5–24; Nanau Decl., Ex. 25). Marks emailed McCarthy confirming that no one in HR or Motorola management had spoken with Thompson or Gallego about the issue. (Nanau Decl., Ex. 35). Thompson confirmed that at some point he learned that McCarthy was going to meet with Oza, but he did not know the specific contents of the complaint. (Thompson Dep. Tr. at 168:24–171:22).

On February 11, Marks recommended that McCarthy work from home until further notice. (Nanau Decl., Ex. 35). Around February 12, McCarthy spoke with Marks and Roby about her complaint. (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67; *see also* Nanau Decl., Ex. 34). The next day, McCarthy met with Oza. (Defs.' 56.1 ¶ 68; Pl.'s 56.1 ¶ 68; Nanau Decl., Ex. 33).

Shortly thereafter, McCarthy began working out of Motorola's Long Island City office. (Pl.'s Dep. Tr. at 159:11–21). Human resources continued their investigation of McCarthy's complaints. (Defs.' 56.1 ¶ 71, Pl.'s 56.1 ¶ 71; *see, e.g.*, Nanau Decl., Ex. 30).

On February 13, Thompson emailed McCarthy requesting project plans. (Nanau Decl., Ex. 28). McCarthy forwarded this request to Marks and Roby, explaining that this was "again to prove my competency" and that she did not want to meet with him again. (*Id.*). Marks responded that this is a typical deliverable for project managers, not a test to prove competency, and that it did not require a meeting, nor did Thompson request a meeting. (*Id.*). On February 18, Thompson emailed Marks and Oza explaining that McCarthy had yet to respond and asking for advice on how to proceed. (*Id.*). In addition, he stated, "This information will help me determine her level of understanding. At this point, I am concerned that she may have overstated her previous experience or her certification." (*Id.*). On that same date, McCarthy sent the deliverable to Marks and Roby directly. (Nanau Decl., Ex. 29).

While working in the Long Island City office, McCarthy's coworker David Ruiz, who was a contractor working with Motorola for more than thirty years, told her that in order to save her job, she needed to tell Motorola that she would relocate, otherwise Thompson would fire her. (Pl.'s Dep. Tr. at 163:24–164:16). On February 15, McCarthy emailed Oza that she would be very interested in a transfer to the Virginia/Maryland area because her daughter and grandson live there. (Nanau Decl., Ex. 37).

During the investigation into the Brooklyn office, Roby found that Gallego "created a hostile work environment" and "pick[s] on new hires, younger and older employees."

(Nanau Decl., Ex. 30 at 8–9). On February 21, Marks emailed McCarthy thanking her for

bringing the issues in the Brooklyn office to their attention and explaining:

> We have completed our investigation into this issue. We were unable
> to substantiate the claims of a hostile and discriminatory work
> environment based on age. Based on feedback as part of the
> investigation, we determined there were inappropriate actions taking
> place in the Brooklyn, NY office and we are taking action . . . Again,
> we appreciate you bringing this to our attention and want to remind
> you that Motorola has zero tolerance for any sort of retaliation and
> ask that you let us know immediately if any sort of retaliation occurs.

(Nanau Decl., Ex. 36; *see also* Pl.'s Dep. Tr. at 303:6–24).

On March 3, human resources met with Thompson and Gallego to discuss

Gallego's behavior. (Nanau Decl., Ex. 17). Gallego was issued a Class II Final written

warning, which is the final warning before termination, transferred out of the Brooklyn

office, assigned additional trainings, and became ineligible for a raise for one year. (Defs.'

56.1 ¶ 77; Pl.'s 56.1 ¶ 77). Thompson also received a review on his management

techniques. (Thompson Dep. Tr. at 185:10–91:7).

B.   Plaintiff's Employment in the Virginia/Maryland Office

On February 21, 2020, Elaine Durovey ("Durovey"), a Territory 3 Services Manager

for the Virginia/Maryland office, emailed her team:

> I can't explain exactly how this happened, but I've been told that
> [McCarthy] is now part of our team. Most of my needs are in VA right
> now, but I wanted all of you to see her resume and weigh in on where
> she might best fit in. . . . She has a lot of backhaul experience, so
> maybe VSP? Not any civil experience so I don't know that she is a
> good fit for Green/Madison or Dinwiddie.

(Nanau Decl., Ex. 39). After a small email exchange, Durovey wrote again, "I'm thinking

VSP…" (*Id.*). In another email that same date regarding "Staffing," Durovey wrote, "This

is what I'm thinking. Kevin Mumma for G/M[.] Sue for Liberty[.] [McCarthy] for VSP and maybe to help you in State of DE?"[1] (ECF No. 56-19 ("Stein Decl."), Ex. D).

On March 2, 2020, after an initial conversation between McCarthy and Deborah Edwards ("Edwards"), the Motorola Program Director to whom McCarthy would report directly, Edwards emailed Durovey:

> OMG! [McCarthy] is a hoot! If the group thinks that I'm a bit aggressive. Just wait until they meet [McCarthy]. I'll have to work with her to keep her within the boundaries of what I need her to do. But, Ill [*sic*] say this…. She'll be a really great backup plan should Andrew [Piwetz] decide to leave.

(Nanau Decl., Ex. 40).

Plaintiff began working in the Virginia/Maryland office the first week of March 2020. (Pl.'s Dep. Tr. at 325; Defs.' 56.1 ¶ 84; Pl.'s 56.1 ¶ 84). A few days later, she emailed Marks about the normal work environment there. (Defs.' 56.1 ¶ 85; Pl.'s 56.1 ¶ 85). After some confusion regarding whether her moving expenses were to be covered, Motorola ultimately paid for McCarthy's relocation costs. (Defs.' 56.1 ¶ 88; Pl.'s 56.1 ¶ 88).

On March 10, 2020, Andrew Piwetz ("Piwetz"), the Project Manager for the State of Maryland Project, emailed Edwards with a list of "roles that may be good fits" for McCarthy, explaining that the roles were "[n]othing too complex too soon since she doesn't know our customer or subcontractor." (Nanau Decl., Ex. 55).

Upon her start at the Virginia/Maryland office, McCarthy was assigned documentation duties for the State of Maryland project. (Healey Decl., Ex. G ("Edwards

---

[1] Plaintiff contends that "VSP" stands for "Voluntary Severance Plan" (Pl.'s Mem. at 8; Pl.'s 56.1 ¶ 186). Meanwhile, Defendant submits evidence that in this context "VSP" is a client. (*See* Durovey Dep. Tr. at 19:8–20:18; ECF No. 58-2, Exs. A at 5, B). Plaintiff points to no evidence beyond her own conclusory belief that Durovey was referencing anything to do with retirement. Further, Motorola's Voluntary Severance Plan was not offered until mid-May 2020, as part of Motorola's Covid-19 Pandemic finance plans. (*See* Stein Decl., Ex. F). Accordingly, Plaintiff has not raised a dispute of fact.

Dep. Tr.") at 15:12-22; Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 95). McCarthy asserts that the documentation project for the State of Maryland was a years-worth of fulltime work. (Pl.'s 56.1 ¶ 95). Edwards stated that she "knew the effort would take most of the year, till the end of the contract . . . So it's not – it didn't all have to be done in a month of six months. It was going to be done over the course of the year until that deliverable was viewed." (Edwards Dep. Tr. at 20:10–19). Further, Edwards stated, "I can't recall the documentation, that that would be 40 hours by itself." (Edwards Dep. Tr. at 93:15–17).

In early to mid-March, the Covid-19 Pandemic changed how the offices operated. (Defs.' 56.1 ¶ 100). McCarthy "couldn't go to the office once it was shut down," but it is unclear if that occurred in March or later in June. (Pl.'s Dep. Tr. at 329:6–330:23). If the latter, then employees were only returning to the office sporadically for meetings. (*Id.*). Regardless of the timing, at some point after in-office work was limited, McCarthy continued to go to a warehouse approximately three days a week for a couple of weeks. (Pl.'s Dep. Tr. at 330:8–19).

Around May 2020, three contractors' contracts—John Mallory, Stacey Pomeroy, and administrative assistant Jackie Grove—expired. (Defs.' 56.1 ¶ 105; Pl.'s 56.1 ¶ 105; Pl.'s Dep. Tr. at 344:12–346:24). Motorola did not extend these contracts, but instead, McCarthy and others absorbed the roles. (Defs.' 56.1 ¶¶ 105–06; Pl.'s 56.1 ¶¶ 105–106; *see, e.g.*, Stein Decl., Ex. E). Edwards stated that the contractors' "work was as needed, not consistently the same every week," which is why they were able to offload it onto the team. (Edwards Dep. Tr. at 94:6–11). On May 8, 2020, Piwetz put together a list of administrative tasks that were to be redistributed among the team. (Stein Decl., Ex. E).

The document shows that McCarthy was guaranteed approximately an extra forty hours per month in administrative work alone. (*Id.*).

With respect to Stacey Pomeroy's roles, McCarthy absorbed asset management, which meant tracking and tagging assets that came into the warehouse, updating the database on their location, and ensuring that the items got to the correct field locations. (Edwards Dep. Tr. at 38:3–21; Pl.'s Dep. Tr. at 394:19–395:11; Nanau Decl., Ex. 10 ("Piwetz Dep. Tr.") at 42:5–43:14). McCarthy contends that the asset management required the handling of the assets and shipments themselves, or in other words, handling the heavy boxes. (Pl.'s Dep. Tr. at 345:19–346:15). But when McCarthy wrote confirming her new roles to Edwards and included "Warehouse duties," Edwards responded, "NO These tasks are not within your responsibility." (Stein Decl., Ex. G).

In addition, McCarthy took over John Mallory's "DR/CM & Training Coordination" responsibilities. (Nanau Decl., Ex. 41). On May 8, Piwetz forwarded McCarthy training materials for this role, although noted that it was a little late since she had already began training for it. (*Id.*). Edwards stated this was not a fulltime position because Mallory had other responsibilities elsewhere. (Edwards Dep. Tr. at 43:17–20). In the email clarifying McCarthy's roles, Edwards stated that the DR/CM & Training Coordination "does not require[] conducting any training." (Stein Decl., Ex. G).

Generally, Piwetz explained that "[i]t was a little frustrating" working with McCarthy because she "didn't pick things up as quickly as we anticipated" and she felt "overwhelmed at times." (Piwetz Dep. Tr. at 58:20–59:18). Although Piwetz does not remember specific conversations, he recalls McCarthy mentioning being overwhelmed because he "was trying to ramp her up on everything." (*Id.* at 59:12–23).

On May 15, 2020, as a result of the Covid-19 Pandemic, Motorola offered a Voluntary Severance Plan (the "Plan"), which was an early retirement offer, to eligible employees. (Defs.' 56.1 ¶ 107; Pl.'s 56.1 ¶ 107; Stein Decl., Ex. F). McCarthy testified that Edwards pressured her into taking the Plan, but that she wanted to continue working, so to stop Edwards from continuing to pressure her, she emailed Durovey that she would not be applying for the Plan. (Pl.'s Dep. Tr. at 333:12–339:11). Further, McCarthy testified that she did not complain that the Plan was offered to her. (Pl.'s Dep. Tr. at 336:15–17). In response to an email from management asking for an estimate on how many eligible employees there were and how many would be accepting the Plan, Durovey stated that she had five eligible people on her team and that she knew McCarthy would not be applying. (Nanau Decl., Ex. 52).

On May 29, 2020, Durovey emailed Oza, to whom she also reported, explaining:

> I'm really struggling with the fact that we were required to accept [McCarthy] for the following reasons:
>
> 1. We are not able to put her in a customer facing role
>
> 2. She is making more money than Andrew Piwetz who is running multiple SOM projects and working to close out P5.
>
> 3. We have only been able to give her administrative tasks, and frankly I don't know how well she is doing those.
>
> 4. I don't even think we are getting a full day out of her based on the tasks she's been given. She has indicated that she lives with her daughter and takes care of her grandson.

(Nanau Decl., Ex. 53 at 1–2). In response, Oza stated:

> The concern we discussed about starting [McCarthy] easy was due to her lack of familiarity with [State of Maryland] and [Territory 3] in general. After this introduction time, please start giving her additional work as appropriate. We can discuss additional options if she is not

> willing or able to take on the responsibilities that are in line with her
> grade level and pay.

(*Id.*). McCarthy was not on copy for these emails. (*Id.*). Around this time, Amir Abtahi ("Abtahi") came on as a counterpart to Durovey and began taking over for Edwards on the State of Maryland project. (Healey Decl., Ex. H ("Durovey Dep Tr.") at 54:17–21).

On June 15, 2020, Abtahi emailed Oza asking to keep one contractor for thirty to sixty days for one project due to the "excitement going into the end of the year with the final coverage testing" and so that McCarthy could "settle[] in with all of the work that is offload[ed] to her." (Nanau Decl., Ex. 45). Oza declined granting the extension. The next day, Edwards and McCarthy met to discuss McCarthy's responsibilities. (Nanau Decl., Ex. 43). McCarthy testified that at that meeting she tried to explain to Edwards "that, you know, this was a lot of work that was involved in these different positions." (Pl.'s Dep. Tr. at 360:23–361:7). McCarthy memorialized the meeting in an email, and in response, Edwards clarified McCarthy's roles and stated:

> we discussed that someone at your level . . . should be able to
> perform these tasks. You've spent significant time cross training with
> the persons currently performing the tasks. It's projected that many
> of the tasks have peaks and valleys of work requirements and don't
> have a daily work requirement . . . With proper planning, there will be
> 'gap time' in your weekly schedule where you'll focus on collection of
> documentation[.]"

(Nanau Decl., Ex. 43). Edwards forwarded this email to three of her supervisors, including Durovey, Abtahi, and Oza, explaining:

> Per your request to ask [McCarthy] to take ownership of her work, I
> had a meeting…I stated that it's time to change her thinking from
> being a trainee to having the primary responsibility and being the
> 'doer' of the work . . . We discussed that none of the individual tasks
> that have been assigned to her is a full work week by effort of itself,
> and that the combination of the work assigned to her can be
> considered a full time position.

(Nanau Decl., Ex. 44). Abtahi thanked her for the follow up and inquired, "Is there an opportunity to stress test her in the next two weeks in all aspects of what she needs to perform? Let's please be sure there is skillset and capacity on her part." (*Id.*). Abtahi further stated, "every assignment to her needs to have a definite end date/clear expectation. We cannot fail her by not providing her clear set of expectations. For ongoing effort such as documentation, there needs to be an expected run-rate." (*Id.*).

On June 26, 2020, Edwards emailed McCarthy about setting a weekly meeting so that Edwards can understand McCarthy's workload and so that McCarthy is aware of the expectations that are set. (Nanau Decl., Ex. 42). That same day, McCarthy resigned from Motorola. (Nanau Decl., Ex. 15). McCarthy testified that this resignation letter was the extent of her complaint about her working conditions in the Virginia/Maryland office to Oza. (Pl.'s Dep. Tr. at 259:7–22; 264:14–16). She also stated that the only complaint she made about Edwards was with respect to getting her relocation expenses covered, and the expenses were then covered after human resources told Edwards to do so. (Defs.' 56.1 ¶ 93; Pl.'s 56.1 ¶ 93; Pl.'s Dep. Tr. at 369:22–370:16). In her resignation letter, she stated that as a result of the staffing changes:

> I have been reassigned a variety of additional duties. While I understand that we are in a transitional period, it seems that the stress of learning three new job descriptions, coupled with the rigorous physical requirements of managing warehouse assets has driven my decision to depart from Motorola. The physical requirements of working in a warehouse left me feeling physically unwell, and the complete departure of any support system as project manager has created an environment of mental stress that is intolerable.

(Nanau Decl., Ex. 15). McCarthy said that her "original job description was already a 40 hour work week," and that the additional jobs bring her total weekly hours up to approximately 135 hours per week. (*Id.*). She further explained:

> this week we should be receiving two hundred plus boxes each weighing 30 lbs (6,000 lbs of equipment) . . . The person that will be unpacking, repacking and asset tagging these items, and uploading to Infoream needs to be aware that during the time that they are working in the warehouse he/she will also need to multi task as admin, as I did last week, and should be prepared to take copious meeting notes while working to unload the pallets within the amount of time the program manager has allotted. As a personal aside, I will add that during these summer months the warehouse is not climate controlled.

(*Id.*). McCarthy concluded that "there are simply not enough hours in the week to properly manage the new and strenuous job duties that I have been given, and although I have made every attempt to seek advisement I feel that I can no longer jeopardize my personal wellbeing in unsafe working conditions." (*Id.*).

III.   Procedural History

Plaintiff commenced this action on July 16, 2021. (*See* Compl.). Defendants answered the Complaint on October 13, 2021, (ECF No. 13), and discovery commenced shortly thereafter. (Minute Entry and Order dated 12/15/2021). On December 8, 2022, discovery was certified as closed. (Minute Entry and Order dated 12/08/2022). The parties subsequently engaged in premotion letter practice in anticipation of the current motion. (ECF Nos. 33–38). On January 18, 2024, Defendants filed their fully-briefed motion for summary judgment. (ECF Nos. 55–58).

## **LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, a district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, "the court cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 15–16 (2d Cir. 1995 (emphasis in original) (quotation omitted). The moving party bears the burden of establishing that no material fact is in dispute, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), and "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). A genuine dispute as to material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"[W]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," and in that case, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact tor trial in order to avoid summary judgment." *CLP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotation omitted); *see also Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). To survive a summary judgment motion, a

nonmovant "need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a *genuine issue for trial*." *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties" does not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247–48. Instead, an opposing party must set forth "concrete particulars" to show that a trial is necessary. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quotations omitted). "[W]hile summary judgment must be granted with caution in employment discrimination actions . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Osinoff v. Nuvance Health*, No. 22 Civ. 2017 (KMK), 2024 WL 967190, at *6 (S.D.N.Y. Mar. 5, 2024) (quotation omitted).

## DISCUSSION

Plaintiff claims NYCHRL violations for the activities that occurred in the Brooklyn Motorola office and ADEA violations for the activities that occurred in the Virginia/Maryland office. (*See* Compl. ¶¶ 113–33; ECF No. 57 ("Pl.'s Mem.") at 10–25). Defendants seek summary judgment on all claims, arguing that Plaintiff cannot make out a prima facie case for discrimination or retaliation under either statute and that even if she could, Defendants offer valid, non-discriminatory reasons for their actions.[2] (ECF No. 56

---

[2] Defendants also argue that Plaintiff failed to exhaust her administration remedies with respect to her ADEA claims because her charge with the Equal Employment Opportunity Commission does not allege that her relocation to Virginia/Maryland was an adverse action. (Defs.' Mem. at 23–24). Because Plaintiff does not argue that her relocation to Virginia/Maryland is part of the discrimination or retaliation she suffered under

("Defs.' Mem.") at 4–23). Meanwhile, Plaintiff asserts that she has met her prima facie burden on all claims and that because she can demonstrate that Defendants' alleged non-discriminatory reasons are pretextual, there is a genuine dispute of fact. (Pl.'s Mem. at 10–25). The Court begins its analysis with the federal claims under the ADEA.

I.     Plaintiff's ADEA Claims

Plaintiff alleges that during her employment at Motorola's Virginia/Maryland offices, Motorola discriminated and retaliated against her in violation of the ADEA. (Pl.'s Mem. at 20–25). ADEA claims for both discrimination and retaliation are governed by the three-step, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106, 110 (2d Cir. 2010). Under the burden-shifting framework, first, a plaintiff must establish a prima facie case of discrimination or retaliation. *Id.* at 106 (citations omitted). If a plaintiff does so, then at step two, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Third, once a defendant sufficiently provides a reason, the plaintiff cannot rely on the prima facie case, "but may prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.* (citation omitted).

A.     Plaintiff's Discrimination Claim

It is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). At

_____

the ADEA (Pl.'s Mem. at 15), the Court neither address this argument nor examines the transfer as part of the ADEA claim.

the first step of the *McDonnell Douglas* framework, to establish a prima facie case of age discrimination, a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107 (citation omitted). In general, the "burden is not a heavy one." *Id.*

Here, the first two elements are easily met. First, Plaintiff is part of a protected class. *See* 29 U.S.C. § 631(a). Second, McCarthy submits her resume, which demonstrates that she has years of project management experience. (Nanau Decl., Ex. 4). As such, Plaintiff has established that she was qualified for the position.

Turning to the third element, an "adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quotation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (quotation omitted). However, "criticism, verbal reprimands, and notices of potential discipline, by themselves, do not qualify as adverse employment actions." *Stewart v. City of New York*, No. 22-2775, 2023 WL 6970127, at *2 (2d Cir. Oct. 23, 2023) (collecting cases). Likewise, a "change in job duties does not automatically qualify as an adverse employment action." *Dinkins v. Mayorkas*, No. 23 Civ. 10660 (RFT), 2024 WL 1806174, at *4 (S.D.N.Y. Apr. 25, 2024) (citation omitted).

Here, Plaintiff claims two adverse employment actions: (1) de facto demotion and (2) constructive discharge.[3] (Pl.'s Mem. at 20–25). The Court takes them each in turn.

### 1. De Facto Demotion

Plaintiff claims that she was de facto demoted because "she was required to perform her duties and the duties of three departing contractors, which included working in a hot warehouse three days a week, while her colleagues worked from home during the early months of the COVID pandemic." (Pl.'s Mem. at 21).

A demotion is dependent on the facts of each case, but may be evidenced by a decreased salary, lost benefits, change in title, or diminished responsibilities. *See Leavitt*, 465 F.3d at 90. By contrast, a de facto demotion occurs "without diminution of salary, title,

---

[3] The Court notes that several months ago, in the context of a Title VII case where the plaintiff suffered an involuntary transfer, the Supreme Court held that to establish an adverse employment action, the plaintiff "does not have to show . . . that the harm incurred was significant. Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024) (quotation omitted). Instead, a plaintiff "need show only some injury respecting her employment terms or conditions." *Id.* at 359.

The Second Circuit has not yet opined on whether its standard for adverse employment action under the ADEA has changed post-*Muldrow*, but courts traditionally apply the same standard to Title VII claims as they do to ADEA claims. *See Ruhling v. Tribune Co.*, No. 02-CV-2430 (ARL), 2007 WL 28283, at *7 (E.D.N.Y. Jan. 3, 2007) (collecting cases); *see also Milczak v. General Motors, LLC*, 102 F.4th 772, 787 (6th Cir. 2024) (applying *Muldrow* to an ADEA claim involving an involuntary transfer). Further, "[i]t is uncertain whether the Supreme Court's 'some' harm standard and overruling of the 'material' harm standard applies to discrimination claims beyond the involuntary transfer context." *Rackley v. Constellis, LLC*, No. 22-CV-4066 (GHW) (RWL), 2024 WL 3498718, at *21 (S.D.N.Y. June 17, 2024); *see, e.g.*, *Cavanaugh v. Wal-Mart Stores E., LP.*, No. 22-CV-1908 (MEM), 2024 WL 2094010, at *4 (M.D. Pa. May 9, 2024) (declining to apply the "some" harm standard to a case where the plaintiff's alleged adverse employment action was not an involuntary transfer); *Anderson v. Amazon.com, Inc.*, No. 23 Civ. 8347 (AS), 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024) (applying the some hard standard outside the involuntary transfer context). Because the basis for the Supreme Court's decision was the express language of Section § 2000e-2(a)(1), the some harm standard likely does apply outside the involuntary transfer context. *See Muldrow*, 601 U.S. at 354–56; *Rackley*, 2024 WL 3498718, at *21.

As noted, Plaintiff's claimed adverse employment actions are de facto demotion and constructive discharge. Regardless of whether *Muldrow* applies, Plaintiff is unable to make out a prima facie case for either alleged adverse action because (1) applying either standard, there is no evidence that a de facto demotion occurred, and (2) the elements of constructive discharge in themselves require that the workplace be so intolerable that a reasonable person would feel compelled to resign, *see Green v. Town of East Haven*, 952 F.3d 394, 404–05 (2d. Cir. 2020), which is not a situation contemplated by *Muldrow*.

or benefits." *Krishnapillai v. Donahoe*, No. 09-CV-1022 (NGG) (SMG), 2013 WL 5423724, at *11 (E.D.N.Y. Sept. 26, 2013). To determine whether a plaintiff suffered a de facto demotion, courts look to whether there was "a dramatic downward shift in skill level required to perform job duties. Other considerations include allegations of harm to plaintiff's reputation, limited opportunities for advancement, and reduced earning potential." *Gallo v. Second Taxing Dist. of City of Norwalk*, 507 F. Supp. 2d 164, 174 (D. Conn. 2007) (quotation omitted) (collecting cases).

Courts have found that a plaintiff produces sufficient evidence for a reasonable juror to conclude that they suffered a de facto demotion either when the plaintiff was involuntary transferred and suffered a materially adverse change or when there was a threat of termination. *See, e.g.*, *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 290 (S.D.N.Y. 2008) ("When an employer imposes new conditions of employment and combines those conditions with a threat of termination for non-compliance, such a combination may give rise to a [de facto] demotion, thereby creating an adverse employment action."); *Gallo*, 507 F. Supp. 2d at 174 (a reasonable factfinder could conclude that the plaintiff's involuntary transfer from the electrical department to the maintenance department was a demotion); *Ahmad v. New York City Health and Hospitals Corp.*, No. 20 Civ. 675 (PAE), 2021 WL 1225875, at *17 (S.D.N.Y. Mar. 31, 2021) (on a motion to dismiss, finding that the plaintiff sufficiently alleged de facto demotion when his responsibilities were diminished due to a forced rotation and he was evaluated by a peer rather than the norm, i.e., a higher-level supervisor); *Claes v. Boyce Thompson Inst. for Plant Research*, 88 F. Supp. 3d 121, 126–27 (N.D.N.Y. 2015) (allegations of an involuntary transfer were sufficient to plead a de facto demotion). Without these indices

of a de facto demotion, courts find that the doctrine does not apply. *See, e.g.*, *Cavanaugh v. County of Nassau*, No. 13-CV-3389 (SJF), 2015 WL 5794211, at *6 (E.D.N.Y. Sept. 30, 2015) (the plaintiff's belief that a temporary reassignment was a de facto demotion was insufficient evidence of an adverse employment action); *Krishnapillai*, 2013 WL 5423724, at *11 (refusing to "extend the concept of [de facto] demotion to cover a situation where an employee is not subject to a change in salary, benefits, title, or location").

Here, Plaintiff did not suffer from a reduced salary, change in title, or loss of benefits. Rather than a diminution of responsibilities, which often evidences a de facto demotion, Plaintiff's responsibilities increased—more skill was required to perform her assigned duties, not less. Further, McCarthy does not claim that she suffered any reputational harm, limited advancement opportunities, or a reduced earning potential. In addition, there is no evidence that McCarthy was threatened with termination or a demotion. Plaintiff does not cite to any case where an *increase* in responsibilities is considered a de facto demotion, and on the facts of this case, the Court refuses to hold as such. Therefore, Plaintiff fails to establish that she was subjected to a de facto demotion.

## 2. Constructive Discharge

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004) (quotation omitted). Courts "generally focus on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions." *Id.* If a plaintiff "cannot show specific intent, he or she must as least demonstrate that the employer's actions

were deliberate and not merely negligent or ineffective." *Id.* at 229–30 (quotation omitted and alterations adopted). As to the second inquiry, "a constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely difficult or unpleasant." *Green v. Town of East Haven*, 952 F.3d 394, 404 (2d. Cir. 2020) (citation omitted). Rather, the standard is an objective one. *Id.* Accordingly, "a plaintiff makes a prima facie showing of an adverse employment action if she adduces evidence from which a rational juror could infer that the employer made her working condition, viewed as a whole, so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* at 404–05 (quotation omitted).

Applying these principles here, Plaintiff fails to establish a prima facie case for constructive discharge. The undisputed facts are: (1) McCarthy started working in the Virginia/Maryland office the first week of March 2020 (Defs.' 56.1 ¶ 84; Pl.'s 56.1 ¶ 84); (2) McCarthy was assigned a documentation role for the State of Maryland project (Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 95); (3) the Covid-19 Pandemic forced employees to primarily work from home, but McCarthy continued to work at a warehouse three times per week for a few weeks (Defs.' 56.1 ¶ 100; Pl.'s Dep. Tr. at 329:6–330:23); (4) three contractors' contracts expired, and their job responsibilities were split among full-time employees, but chiefly McCarthy (Defs.' 56.1 ¶ 105; Pl.'s 56.1 ¶ 105); (5) on May 15, 2020, eligible employees were offered a Voluntary Severance Plan (Defs.' 56.1 ¶ 107; Pl.'s 56.1 ¶ 107); (6) Edwards pressured McCarthy into accepting the Voluntary Severance Plan, but McCarthy opted to continue working and emailed Durovey that she would be declining the Plan (Pl.'s Dep. Tr. at 333:12–339:11); (7) Edwards sought weekly meetings with

McCarthy to ensure that she was on track with her responsibilities (Nanau Decl., Ex. 42); and (8) shortly after a meeting between McCarthy and Edwards about McCarthy's responsibilities, McCarthy resigned (Nanau Decl., Exs. 15, 43).

McCarthy asserts that because of the contractors' roles she was meant to absorb, she would have been required to work a 135-hour workweek. (Nanau Decl., Ex. 15). Meanwhile, email exchanges between and testimonies of Edwards, Piwetz, Durovey, and Abtahi demonstrate that management started McCarthy with a smaller amount of responsibility so that she could be trained, and that, even with the ramp up, a project manager of her level should be able to handle the roles she was given. (Nanau Decl., Exs. 52, 55; Piwetz Dep. Tr. at 58:20–59:23). Although this is a dispute of fact, it is immaterial because Plaintiff is still unable to establish a claim for constructive discharge.

The record indicates, and the parties agree, that Motorola increased McCarthy's responsibilities and workload. Construing all ambiguities in McCarthy's favor, the Court assumes for the purposes of this motion that Plaintiff was required to work 135 hours per week, inclusive of handling heavy shipments in a hot warehouse. The issue thus becomes whether this increased workload is sufficient to have created a workplace so intolerable that a reasonable person in McCarthy's shoes would have felt compelled to resign. *See Town of East Haven*, 952 F.3d at 404–05. "The Second Circuit has prescribed that a plaintiff must comply with a more robust showing of oppression and discord than mere displeasure with his or her working conditions or circumstances in order to establish a constructive discharge claim." *Smith v. County of Sullivan*, No. 05 Civ. 9114 (LMS), 2007 WL 9817915, at *5 (S.D.N.Y. May 25, 2007) (collecting cases). "Such heightened proof of caustic working conditions may include evidence of an employer's intent to terminate

an employee from his or her position of employment by initiating disciplinary action against the employee, criticizing the employee with more ferocity than other employees, or altering the employee's working conditions to effectuate changes in job responsibilities or salary benefits." *Id*. Here, the facts do not give rise to constructive discharge.

First, when an employer has a grievance procedure available through which an employee could have sought redress but the employee failed to avail themself of that procedure, courts generally refuse to find constructive discharge. *See Dall v. St. Catherine of Siena Medical Center*, 966 F. Supp. 2d 167, 179–81 (E.D.N.Y. 2013); *see also Heiden v. New York City Health and Hospitals Corp.*, No. 20 Civ. 10288 (LJL), 2023 WL 171888, at *18 (S.D.N.Y. Jan. 11, 2023) (plaintiff was not required to demonstrate reliance on a grievance procedure when there was a "lack of any facts regarding those procedures and their efficacy"). Here, Plaintiff was well aware of resources by which she could make a complaint, as she had previously done so in the Brooklyn office. In response to those complaints, human resources conducted a full investigation and found that the Brooklyn office was fostering a hostile work environment, although it did not find any age-based discrimination. As a result, human resources took steps remediate the Brooklyn office, including reprimanding and transferring Gallego and critiquing Thompson. As such, there is no evidence that the grievance procedure was ineffective. Even if McCarthy did not know about the consequences of the investigation, she was aware of human resources' responsiveness—Marks and Roby were continuously engaged with McCarthy, informed her of the results of the investigation, told her that they did not tolerate retaliation, and rather than forcing her to remain in the Brooklyn office while the investigation was underway, they suggested that she work from home and moved her to the Long Island

City office. With respect to the alleged 135-hour workweek in the Virginia/Maryland office, Plaintiff presents no evidence that she complained of, sought support, or even asked for help from Durovey, Abtahi, Edwards, Piwetz, or human resources. McCarthy did testify that she told Edwards that this was a lot of work, but beyond this statement, the Court has no evidence of any complaint or request for help. Assuming that McCarthy was being forced to undertake a 135-hour workweek inclusive of working in a hot warehouse handling heavy boxes, she is unable to make a prima facie case for constructive discharge because she failed to avail herself of the effective grievance procedures that were at her disposal.

Even more, McCarthy was supported in her role. Constructive discharge "requires deliberate action on the part of the employer . . . something beyond mere negligence or ineffectiveness." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000) (citations omitted). Edwards and McCarthy met in mid-June to review Plaintiff's responsibilities, and Edwards planned to set up weekly meetings to provide support and ensure that McCarthy's duties were effectively handled, but McCarthy resigned before those weekly meetings were held. Management discussed behind closed doors how they could support McCarthy in her role, and, only once she was fully supported, if she could not maintain the workload would they discuss next steps. Motorola's attempts to support McCarthy are anything but deliberate actions to create an intolerable work environment.

Although regular meetings and extra support may be uncomfortable, this is insufficient to support a claim for constructive discharge. *Compare Weinstein v. Garden City Union Free School Dist.*, No. 11-CV-2509 (AKT), 2013 WL 5507153, at *26 (E.D.N.Y. Sept. 30, 2013) (even when the plaintiff was called "too old" one time in the workplace, a

negative evaluation, summons for an investigative interview, and critiques of the plaintiff's work did not constitute constructive discharge because all the facts taken as whole did not create a work environment so "difficult or unpleasant" so as to warrant resignation) *with Walsh v. Scarsdale Union Free School Dist.*, 375 F. Supp. 3d 467, 493 (S.D.N.Y. 2019) (in addition to meetings where the plaintiff was encouraged by supervisors to consider retirement, when the plaintiff demonstrated "pervasive harassment by his supervisors," "seemingly arbitrary performance reviews and day-to-day isolation," evidence that peers in the plaintiff's age bracket were treated the same way, an involuntary reassignment, lack of union support, and feelings of social isolation, embarrassment, and mockery—the plaintiff put forth sufficient evidence that a reasonable factfinder could "deduce that the environment was hostile enough to compel a reasonable person to feel forced to resign"). Like the plaintiff in *Weinstein*, McCarthy was not "presented with actual disciplinary charges, nor was [s]he threatened with being fired." *Weinstein*, 2013 WL 5507153, at \*26. (quotation omitted). Enduring workplace critiques and meetings with one's supervisor are insufficient to establish a claim for constructive discharge. *See Rozenfeld v. Dept of Design & Constr.*, 875 F. Supp. 2d 189, 204 (E.D.N.Y. 2012), *aff'd*, 522 F. App'x 46 (2d Cir. 2013).

To the extent that McCarthy was unsettled by her workload and by the management style of the Virginia/Maryland offices, a mere disagreement over management style does not establish constructive discharge, "especially when that disagreement is with a new manager." *Powell v. Dept. of Educ.*, No. 14-CV-2363 (PKC) (SLT), 2018 WL 4185702, at \*7 (E.D.N.Y. Aug. 30, 2018) (citations omitted). Further, "constructive discharge generally cannot be established . . . simply through evidence that

an employee was dissatisfied with the nature of his assignments." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993); *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("To be an adverse employment action," a change in job responsibilities "must be accompanied by materially adverse changes in employment, such as a demotion or a loss of wages.") (citations omitted). McCarthy worked for nearly four months in the Virginia/Maryland office, and an adjustment to different offices, workloads, and management styles are typical workplace growing pains, not indications of constructive discharge. *See Powell*, 2018 WL 4185702, at *7.

As for any age-related hostility, McCarthy only points to one circumstance connected to her age: McCarthy felt pressured "at least two times" by Edwards into accepting the Voluntary Severance Plan. (Pl.'s Dep. Tr. at 333:12–339:11). McCarthy does not demonstrate that anyone else was aware of those statements. Although Plaintiff writes in her memorandum of law that she "complained" about Edwards' comments (Pl.'s Mem. at 21), McCarthy testified that she emailed Durovey declining the Plan so that Edwards would stop bothering her, but she provides no evidence of said "complaint." Again, Plaintiff did not take advantage of any grievance procedure regarding the age-related comments. This single reference to Plaintiff's retirement is insufficient to establish an objectively intolerable work environment. *Compare Weinstein*, 2013 WL 5507153, at *26 (the facts, taken as a whole, including one comment that the plaintiff was "too old," were insufficient to establish constructive discharge) *with Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 89–90 (2d Cir. 1996) (the plaintiff provided sufficient evidence of constructive discharge to overcome summary judgment when (1) plaintiff was "among the most competent employees" in her department; (2) although she had been

reprimanded once for her interpersonal skills, she had improved; and (3) her direct boss and his supervisor regularly yelled insults at her (e.g., "Do you think you are going to outlive us?"), doled out "baseless criticisms," said that she would not "be around" and "would be fired instantly if she did not meet certain ambiguous behavior objectives," told her that she was "too expensive," and mocked her). Further, both Edwards and Piwetz were also eligible for the Plan, and Edwards herself took advantage of the Plan, although McCarthy was unaware of Edwards' acceptance. Thus, Plaintiff produces no evidence of age-related bias that created an intolerable work environment.

Finally, "it is not enough for a plaintiff to resign instead of facing potential disciplinary charges, nor is it enough for a plaintiff to fear termination," but actual "threats of termination may be sufficient" to establish constructive discharge. *Dall*, 966 F. Supp. 2d at 177 (collecting cases); *see also Chertkova*, 92 F.3d at 90 (the combined actions of the plaintiff's boss and his supervisor, including the threat of termination, would allow a factfinder to conclude that the employer "*deliberately* created unbearable working conditions for the purpose of forcing" the plaintiff out of the company) (emphasis in original). In this case, McCarthy does not claim that she was given an ultimatum, nor does she provide evidence that she would be terminated or demoted. The conversations questioning McCarthy's performance and discussing whether she was hired at the right level occurred between management only and without her knowledge, so those conversations could not have been a part of McCarthy's decision to resign.

Considering all of the facts, a reasonable person in McCarthy's shoes would not have felt compelled to resign. McCarthy presents no evidence aside from the alleged 135-hour workweek and Edwards' comments regarding the Voluntary Severance Plan to

support her claim of an intolerable work environment. Therefore, Plaintiff fails to demonstrate a claim for constructive discharge.

In sum, Plaintiff fails to establish a prima facie case for discrimination under the ADEA because she has not demonstrated that she was subjected to an adverse employment action. Therefore, Defendants' motion is granted with respect to this claim.

B.     Plaintiff's Retaliation Claim

To demonstrate a prima facie case of retaliation, a Plaintiff must establish "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski*, 596 F.3d at 110 (citation omitted); *see also* 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . opposed any practice made unlawful by this section").

An individual engages in "protected activity" if they "opposed any practice made unlawful by this section" or "participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). While a "protected activity usually takes the form of filing a formal complaint with an agency or filing a lawsuit," it can also be found where the employee made "an internal complaint to company management." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992). "'[A] retaliation claim may in some instances be established even where there has been no Title VII-prohibited discrimination, *i.e.*, where the plaintiff shows, inter alia, that she had a good faith, reasonable belief that the conduct she opposed violated Title VII and that the employer could reasonably have understood that Title VII-prohibited discrimination was

the subject of her protest.'" *Ruhling v. Tribune Co.*, No. 04-CV-2430 (ARL), 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007) (quoting *Galdieri-Ambrosini v. Nat'l Realty and Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998).

Here, Plaintiff claims that she participated in a protected activity by declining the Voluntary Severance Plan.[4] (Pl.'s Mem. at 21–25). This in itself is not a protected activity because declining a voluntary retirement plan is not Title VII-prohibited discrimination. In her memorandum of law, Plaintiff argues that she "complained" of the fact that Edwards pressured her to participate in the Plan. But Plaintiff produced no evidence of her "complaint" about Edwards. Even more, Plaintiff stated in her deposition that she emailed Durovey that she was not interested in the Plan so that Edwards would stop pressuring her. Without evidence that the employer could reasonably have understood Edwards' age-related comment to be the "subject of her protest," McCarthy is unable to establish that she engaged in a protected activity. *See Galdieri-Ambrosini*, 126 F.3d at 287, 292.

---

[4] The Court notes that plans such as Motorola's Voluntary Severance Plan are lawful. *See* 29 U.S.C. § 623(f)(2)(B)(ii) (allowing "for an employer to observe the terms of a bona fide employment benefit plan that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this chapter"); *see also Loucks v. Bd. of Educ. of Middle County School Dist. No. 11*, 879 F. Supp. 2d 281, 288 (E.D.N.Y.; 2012). In considering the validity of an early retirement plan, courts consider "whether the plan (1) is truly voluntary, (2) is made available for a reasonable period of time, and (3) does not arbitrarily discriminate on the basis of age." *Auerbach v. Bd. of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn*, 136 F.3d 104, 112 (2d Cir. 1998).

Here, the plan was truly voluntary, as evidenced by the fact that Edwards accepted the Plan while Piwetz and McCarthy did not. Second, eligible employees were given two weeks to decide whether they wanted to apply for the Plan. While this is a relatively short timeframe, considering the emergency nature of the Covid-19 Pandemic, two weeks is reasonable in this context. Third, legislative intent reveals that "[b]oth Houses expressly endorsed plans containing a time-related window during which employees, upon attaining a specified age, are offered for a limited period for time a special incentive to retire." *Auerbach*, 136 F.3d at 113. Motorola's Plan is consistent with this purpose as it was offered equally to all eligible employees, with different packages based on the length of their employment, rather than on the basis of age. *See id.* at 114 (distinguishing from *Karlen v. City Colleges of Chicago*, 837, F.2d 314 (7th Cir. 1988), wherein an early retirement plan arbitrarily discriminated on the basis of age when the incentives gradually increased between the ages of 55 and 64, but dropped off for those who retired after the age of 64). Accordingly, the Voluntary Severance Plan is lawful.

Accordingly, Plaintiff fails to establish the first element of a prima facie case for retaliation. Even if, *arguendo*, Plaintiff did participate in a protected activity, she did not suffer an adverse employment action. *See supra* at 22–32. Further, Plaintiff cannot demonstrate that declining the Plan was in any way connected to her increased workload because conversations about how to handle the contractors' departures started in early May, before the Plan was even offered.

Therefore, no genuine material facts exist as to Plaintiff's claim for retaliation under the ADEA, and the Court grants Defendants' motion as to this claim.

II.    NYCHRL Claims

Plaintiff also brings causes of action under the NYCHRL for hostile work environment and retaliation in Motorola's Brooklyn office.

Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may, at its discretion "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). "Although '[t]he exercise of supplemental jurisdiction is within the sound discretion of the district court,' the Second Circuit has stated that if a plaintiff's federal claims are dismissed before trial, pendant state and city claims should be dismissed as well." *Fraser v. MTA Long Island Rail Road*, 307 F. Supp. 3d 105, 120 (E.D.N.Y. 2018) (first quoting *Lundy v. Catholic Health Sys. of Long Isl. Inc.*, 711 F.3d 106, 117 (2d Cir. 2013) and then citing *Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010)); *see also Lebowitz v. New York City Dept. of Educ.*, Nos. 15-CV-2890, 15-

CV-5548 (LDH) (ST), 2020 WL 7024362, at *10 (E.D.N.Y. Nov. 30, 2020) (declining to exercise supplemental jurisdiction over state and city causes of action after granting the defendant's motion for summary judgment and dismissing the plaintiff's claims under the ADEA); *Kho v. New York and Presbyterian Hospital*, 344 F. Supp. 3d 705, 724 (S.D.N.Y. 2018) (same). This general rule aligns with the Supreme Court's statement that when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise [supplemental] jurisdiction[.]" *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims. The Court dismisses these causes of action without prejudice to their pursuit in State court.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted with respect to Plaintiff's first and second causes of action, alleging claims under the ADEA. The Court declines to exercise supplemental jurisdiction over the third and fourth claims, alleging violations of the NYCHL, and dismisses those claims without prejudice. The Clerk of the Court is directed to enter judgment for Defendants in accordance with this Memorandum and Order and close this case.

SO ORDERED.

Hon. Ramón E. Reyes, Jr.   Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2024.08.28 15:40:12 -04'00'

RAMÓN E. REYES, JR.
United States District Judge
Dated: August 28, 2024
      Brooklyn, NY